# AFFIDAVIT

I, Jason Simonian, being duly deposed and sworn, say:

1. I am a Special Agent with the United States Food and Drug Administration's Office of Criminal Investigation (FDA-OCI), and have been so employed since September of 1996. I was previously employed as a Special Agent of the United States Department of Labor for approximately 8 years. As an FDA-OCI Special Agent, I primarily conduct investigations into suspected violations of the Federal Food, Drug and Cosmetic Act. I have also been trained by the (FDA-OCI) in those various means and methods by which illegal drug traffickers obtain possess, transport, divert, and distribute controlled substances, including anabolic steroids. I have also received training from the FDA-OCI in the means and methods by which drug traffickers launder their drug trafficking proceeds so as to disguise the origin of said proceeds and make it appear as if those proceeds were obtained from legitimate and lawful source(s) of activity.

2. I make this affidavit in support of the following:

A. Search warrants for the following described premises:

(i) The premises described as 58 Youngs Avenue, West Warwick, Rhode Island, and further described as a multi-level, single-family residence with white vinyl and black shutters. The number "58" is clearly displayed in black letters above the front door and beneath a white awning.

(ii) The premises described as Powerhouse Gym, located at 3751 Mendon Road, Cumberland, Rhode Island, and further described as a one-story commercial building displaying red brick and large glass windows towards the front. "POWERHOUSE GYM" is displayed in red lettering on a white background and

"FITNESS CENTER" is displayed in white lettering on a red background directly above the front entrance.

B. A Temporary Restraining Order instructing Kenneth Peckham, his agents, servants, employees, attorneys, family members, those persons having any interest or control over the business known as Ocean State Fitness Incorporated d/b/a Powerhouse Gym, 3751 Mendon Road, Cumberland, Rhode Island and those in active concert or participation with PECKHAM, that they shall not, without approval of the Court upon notice to the United States and an opportunity for the United States to be heard:

> a) alienate, dissipate, transfer, sell, assign, lease, pledge, encumber, or dispose of, in any manner, directly or indirectly;
>
> b) cause to be alienated, dissipated, transferred, sold, assigned, leased, pledged, encumbered, or disposed of in any manner; or
>
> c) take, or cause to be taken, any action which could have the effect of concealing or moving from the jurisdiction of this Court, or that would have the effect of depreciating, damaging or in any way diminishing the value of the business known as Ocean State Fitness Incorporated d/b/a Powerhouse Gym, 3751 Mendon Road, Cumberland, Rhode Island, including any of its assets.

The temporary restraining order should also require that all revenues of the corporation or entity described above be deposited into existing financial institution accounts of said corporation or entity and that funds drawn from said accounts only be used to pay expenses incurred in the "ordinary course of business" which is defined as follows:

> expenditures and transactions made directly in bona fide arm's length transactions as part of the regularly conducted business; (i) purchase and/or necessary use of supplies and equipment; (ii) payment of accounts payable, including but not limited to, those relating to rent, mortgage, insurance premiums, license fees, utilities, and taxes; (iii) payment of

reasonable and necessary employee salaries; and (iv) payment of the normal and necessary upkeep and/or maintenance of any real property, equipment, and furnishings and fixtures necessary for regularly conducted business operations.

The temporary restraining order should also require that all of the transactions described above be recorded in accordance with generally accepted accounting principles evidenced by cash register slips, sales receipt journal(s), bank deposits, numerical invoices and order forms, disbursements, journals, checks, computer printouts, inventory lists, and any other ordinary business records.

3. The information contained within this affidavit comes from my investigation of this matter and information I have received from other FDA-OCI agents, FDA-OCI Task Force agents, agents of the United States Drug Enforcement Administration (DEA), agents of the Criminal Investigation Division of the United States Internal Revenue Service (IRS-CID), and Inspectors of the United States Postal Inspection Service (USPS). Information contained within this affidavit also comes from a reliable FDA-OCI confidential informant and two confidential sources. I have also reviewed the audio recordings made during the course of this investigation and have viewed the various premises described in paragraph 2 above. This affidavit does not contain every fact known to me concerning this investigation but only sufficient facts, which I believe support the requests in paragraph 2 above.

4. As noted above, this investigation involves the use of a reliable confidential informant, hereafter referred to as CI #1. CI #1 has been arrested for a drug related offense in the past and has received a deferred sentence. CI #1 has provided information in the past that has led to the successful arrest and conviction of individuals on drug

related charges. CI #1 has received monetary compensation in the past from law enforcement agencies in exchange for information and services but has received no compensation to date on this investigation. I have not known CI #1 to provide me with knowingly false information.

5. In July of 2004, I was contacted by CI #1 who advised me that he had information regarding the illegal manufacturing and distribution of anabolic steroids. Specifically, CI #1 informed me that CI#1 is familiar with Kenneth Peckham, hereafter referred to as PECKHAM. CI #1 said that PECKHAM is the owner of Powerhouse Gym. CI #1 further advised that PECKHAM was selling and manufacturing steroids from inside the Powerhouse Gym. According to CI #1, PECKHAM was using the internet to order materials from a source in China to make steroids. CI #1 has observed PECKHAM'S illicit steroid laboratory inside the Powerhouse Gym and has witnessed PECKHAM order illicit materials, utilizing the computer inside Powerhouse Gym. CI #1 provided law enforcement agents with papers containing recipes for the production of steroids and reported that these recipes were obtained by CI #1 directly from PECKHAM'S office located inside of the Powerhouse Gym. Additionally, CI#1 provided a steroid price list from chemicalbases.com, 2 Laoshan Road, Qingdao Shandong, China. CI #1 further provided a catalog from Cole-Parmer Instrument Company and reported that PECKHAM has received equipment from this company to be utilized to manufacture steroids.

6. In July 2004, CI #1 also transferred custody of a vial of white powder, purported to be steroids, manufactured by PECKHAM. A sample of the powder contained within this vial was subsequently field tested by The Rhode Island Department

of Health Laboratories Forensic Sciences Unit and found to contain Oxymetholone, Stanozolol, and Testosterone, all of which are controlled substances (anabolic steroids).

7. Prior to receiving this information and the documents and powder cited above from CI #1, I was unaware of the alleged illegal activities being conducted by Kenneth PECKHAM. I had not directed CI #1 to procure either the documents or powder CI #1 provided to me. Upon receipt of the documents and powder, I advised CI #1 that he was not to take any additional items from the Powerhouse Gym.

8. I have reviewed information from the Rhode Island Secretary of State that indicates PECKHAM is the president and registered agent of Ocean State Fitness, Inc. I have also reviewed documents obtained from Citizen's Bank for a Business Partners Checking account number 5010-1155-1495-395-5 in the name of R.I. Fitness d/b/a Powerhouse Gym. PECKHAM is the sole signatory on this account.

9. I have reviewed documents received from Western Union that indicated "Kenneth Peckham" wire transferred seven hundred and thirty-five dollars ($735.00) to "Jing Chu", Lao Shan Lu 2 Hao, Qingdao, China, which appears to be the same address referred to in paragraph 5 above for the chemicalbases.com price list, on or about August 27, 2003. I know based upon my training and experience and conversation with other agents from the DEA and IRS-CID that drug traffickers frequently rely on wire remitter businesses, such as Western Union in which to transfer currency for the payment of illegal drugs.

10. As part of this investigation, United States Postal Inspector Almindo Correia initiated a "mail watch" at Powerhouse Gym. A mail watch is a process, whereby a mail carrier detects certain information from parcels sent to a specific location and reports the

information to a requesting law enforcement official. On December 4, 2004, I along with other agents met with CI #1. Agents provided CI #1 with an audio recorder and directed CI #1 to engage in a conversation with PECKHAM about the potential purchase of steroids. I have reviewed the audio recording of the conversation between CI #1 and PECKHAM. During the course of the conversation, CI #1 inquired as to purchasing steroids from PECKHAM. PECKHAM told CI #1 that he could not currently supply CI #1 with steroids because, according to PECKHAM, the mailman informed PECKHAM that law enforcement had placed a mail watch on his gym. PECKHAM also told CI #1 that the mailman is a customer of Powerhouse Gym.

11. On December 15, 2004, FDA Task Force Agents Christopher Cardarelli and Timothy Heston directed CI #1 to enter Powerhouse Gym and converse with PECKHAM. CI #1 asked PECKHAM for the web sites PECKHAM utilizes to order steroids and steroid paraphernalia. According to CI #1, PECKHAM wrote down the names of two web sites, WWW.CHEMICALBASES.COM and WWW.VIALSANDCRIMPERS.COM on a piece of paper. CI #1 later gave that paper to TFAs Cardarelli and Heston.

12. I have spoken to Special Agent Daniel MacIsaac, a group supervisor at the Warwick Rhode Island Office of the United States Drug Enforcement Administration. Special Agent MacIsaac has been supervising an investigation into the illicit steroid trafficking activities of Steven Bardi. I have reviewed reports, provided by the DEA, regarding the undercover purchase of illicit steroids from Steven Bardi. According to the reports, Providence Police Detective Louis Stravato, acting in an undercover capacity, had been purchasing steroids from Steven Bardi. Bardi had previously indicated to

Detective Stravato that his source of supply for the illegal steroids was "Kenny", the owner of Powerhouse Gym in Cumberland, Rhode Island. On August 6, 2004, officers, acting in an undercover capacity, met Bardi in the McDonald's parking lot on Branch Avenue, Providence, RI. After a brief conversation, undercover officers followed Bardi to the Powerhouse Gym in a separate vehicle. After arriving at the Powerhouse Gym, Bardi told undercover officers that his steroid supplier was unaware that he (Bardi) was bringing anyone and instructed them (undercover officers) to remain in the parking lot. Bardi then entered the Powerhouse gym. Shortly after, Special Agent MacIsaac observed Bardi meeting with an individual inside the gym, subsequently identified as PECKHAM. Special Agent MacIsaac then observed PECKHAM and Bardi proceed through a door towards the rear of the gym. A short time later, surveillance agents observed Bardi exit the gym and enter his vehicle. Bardi then drove over to the vehicle, occupied by undercover detectives.

13. After meeting with the undercover detectives, Bardi handed Detective Stravato ten ampoules of suspected steroids. Detective Stravato handed Bardi one thousand one hundred dollars ($1,100.00) in official government funds as payment for the steroids. The ten ampoules obtained from Bardi by Detective Stravato were subsequently field tested by the DEA's northeast regional laboratory and found to contain nandrolone decanoate, testosterone cypionate, and testosterone enanthate, all of which are controlled substances (anabolic steroids).

14. On November 11, 2004, law enforcement agents conducted a search of four separate bags located within the contents of a Powerhouse Gym dumpster. I have been advised that either document(s) bearing the name Kenneth Peckham or document(s)

bearing the Citizen's Bank account for Powerhouse Gym (account number 5010 1155 1495 393 5) were located in each of the separate bags. Agents seized various items, corroborating information from CI #1, regarding the illicit manufacture of steroids by PECKHAM from Powerhouse Gym. I have been advised that:

a) several hypodermic needles and syringes from three separate garbage bags were located within the dumpster. I know from my training and experience, that hypodermic needles and syringes are oftentimes utilized in the processing of steroids from a powder form to potentially more desirable oil based form. These hypodermic needles and syringes are used to draw out and transfer fluids in the filtration phase of the process. I have reviewed several recipes, obtained by CI #1, regarding the purported illicit manufacture of steroids (as mentioned in paragraph 5 above). All of these recipes call for the use of needles and syringes during the processing. I further know based upon my training and experience, that hypodermic needles and syringes are often utilized for anabolic steroid consumption, whereby a steroid solution is directly injected into the user's body.

b) an empty 30 milliliter glass vial that was labeled, "BACTERIOSTATIC WATER" was seized from one garbage bag. I know based upon my training and experience that Bacteriostatic water is utilized as a drug diluant.

c) five glass vials from three separate garbage bags, some of which contained red and green colored caps, were seized. On one of these vials, the letter "S" was clearly hand printed on the side of the vial. On four of these vials, the letter "D" was clearly printed on the side of the vial. One of the vials labeled "D" was subsequently analyzed by the State of Rhode Island Forensic Drug Chemistry Unit and found to contain

Testosterone Enanthate, an anabolic steroid and schedule III controlled substance. I know based upon my training and experience that illicit sellers and manufacturers of drugs oftentimes utilize unlabeled, partially labeled, color coded, or different types of containers in which to store illegal drugs or items used in the manufacture of illegal drugs. They do this in an effort to avoid labeling the contents of the container. They do this in order to further thwart law enforcement and third parties from identifying illegal drugs or items used in illicit clandestine drug laboratories. I further know, based upon my review of documents received by CS #1 from PECKHAM (as stated in paragraph 5 above), that the use of glass vials is listed in every recipe for diluting powdered steroids to an oil based form. I have observed during my review of these documents that "RED CAPS" is written in hand next to one of these recipes. I believe that the reference to "RED CAPS" refers to differentiating that specific type of steroid by marking its' container with a red cap.

d) six empty boxes clearly labeled, "Winstrol Depot Stanozolol" were seized from two separate garbage bags. I know based upon my training and experience that Stanozolol is an anabolic steroid and a schedule III controlled substance that is marketed under the trade name Winstrol.

15. I have reviewed invoices obtained from Cole-Parmer Instrument Company that showed shipments of laboratory equipment to PECKHAM at Powerhouse Gym, including:

a) an invoice, dated August 12, 2003 charging Powerhouse Gym a total of $447.33 for the purchase and shipment of a stirrer/hot plate, a twelve pack of 250 milliliter pack of Pyrex beakers, and a three pack of micro-spatulas;

b) an invoice, dated August 21, 2003 charging Powerhouse Gym a total of $89.31 for the purchase and shipment of sixty milliliter syringes, eighteen gauge needles, and a glass thermometer;

c) an invoice, dated September 25, 2003 charging Powerhouse Gym $478.41 for the purchase and shipment of a balance, a vibrating spatula, and weigh paper.

I know based upon conversations with other agents and my own training and experience that a micro-spatula and a vibrating spatula are instruments designed to be utilized in the exact measuring of powders and chemicals.

16. I am advised by TFAs Heston and FDA TFA Albert Faella that they interviewed a confidential source, hereafter referred to as CS #1 on January 5, 2005. CS #1 has been arrested and convicted on a prior drug related offense. CS #1 has also recently been arrested on a drug related offense and is awaiting sentencing. CS #1 has entered into an agreement with the State of Rhode Island Attorney General's Office and hopes to receive a sentence reduction recommendation from the prosecutor in exchange for his/her cooperation on this investigation. CS #1 is familiar with the owner of Powerhouse Gym on Mendon Road in Cumberland, Rhode Island and knows this individual as "Ken". According to CS #1, "Ken" approached CS #1 and another individual approximately seventeen months prior to January 5, 2005 and asked if they wanted to buy "Juice". CS #1 understood the term "Juice" to mean steroids. According to CS #1, he/she (CS #1) eventually purchased steroids on more than one occasion from "Ken". CS #1 reported that he/she (CS #1) got the impression that "Ken" was manufacturing the steroids and asked "Ken" if the steroids worked. According to CS #1, "Ken" affirmed that the steroids did work. CS #1 said that on the first occasion, he/she

purchased a cycle of "Deca" and a "cycle" of "Test" from "Ken". CS #1 said that he/she paid "Ken" a portion of the money in advance for the steroids, while inside the Powerhouse Gym. CS #1 said that "Ken" approached CS #1 in Powerhouse Gym, on a later date, and told CS #1 that he ("Ken") had the steroids. According to the CS, "Ken" went outside and placed the steroids into the vehicle of CS #1. I know based upon my training and experience, users and traffickers of illicit steroids use the terms "Deca" and "Test" to refer to Deca-Durabolin and Testosterone. Deca-Durabolin is the trade name for Nandrolone-Decanoate, an anabolic steroid and a schedule III controlled substance. I further know based upon my training and experience that the term "cycle" is oftentimes utilized by illicit users and traffickers of steroids to define the sequence in which a steroid user consumes different types and quantities of the drug.

17. In March of 2005, TFA Faella and I met with a reliable confidential source, hereafter referred to as CS #2. CS #2 has made a controlled purchase of steroids on this investigation under the supervision of law enforcement. I have never known CS #2 to knowingly provide false information. CS #2 has been recently arrested for a drug related offense and is currently awaiting sentencing. CS #2 has entered into an agreement with the Rhode Island Attorney General's Office and hopes to receive a sentence reduction recommendation from the prosecutor in exchange for his/her cooperation on this investigation. CS #2 knows PECKHAM and has purchased steroids from PECKHAM in the past. On March 24, 2005, CS #2 placed a telephone call to Powerhouse Gym at telephone number 401-658-4400 at the direction of TFAs Heston and Faella. An audio recording was made of the conversation and I have reviewed the transcripts from this recording. The following conversation occurred:

PECKHAM: Powerhouse Gym, How can I help you?
CS #2: Hey Kenny, It's [CS #2]. What's up buddy?
PECKHAM: What's going on?
CS #2: Not much. Are you busy?
PECKHAM: Yeah, Let me give you a call back.
CS #2: Yeah, no problem.
PECKHAM: Bye.
CS #2: Bye.

I am advised that CI #2 received an incoming telephone call, shortly after the termination of the first telephone call. The following conversation occurred during the second call between CS #2 and PECKHAM:

CS #2: Hello.
PECKHAM: What's up [CS #2]?
CS #2: What's up brother? How are you doing?
PECKHAM: Not too bad and you?
CS #2: Not too bad, um, is it cool to talk or are you busy?
PECKHAM: Yeah, I'm, it's Okay.
CS #2: All right, I got ah, um I have about a thousand I could spend right away and in the next couple of days to probably a week tops, I've, another thousand. Is that going to screw you up at all?
PECKHAM: Probably.
CS #2: Really.
PECKHAM: I threw my mortgage money out for that.
CS #2: When is your mortgage due?
PECKHAM: The first. I got to send it in though.
CS #2: All right, um. What if I, ugh, well I will definitely get it to you before the first. Is that okay? Probably like the, last like two days or so of the month.
PECKHAM: I'll mail it but I have to get the money back in there for the first.
CS #2 What's the last day possible that I could get you the money?
PECKHAM: Well I mean, I got to send it in, but I was going to mail my mortgage actually tomorrow.
CS #2: Tomorrow.
PECKHAM: Um.., I'll wait so they get it on the first so they don't cash it yet. So they don't cash it on the first. Why? What did something happen or?

Based upon my training, experience, and knowledge of this investigation, I believe that PECKHAM was stating that he (PECKHAM) used monies that were allocated for his mortgage to purchase steroids to sell to CS #2. I further believe that

PECKHAM is stating that he (PECKHAM) intends to utilize the cash obtained from CS #2 in exchange for the steroids, in order to make a payment on the mortgage at 58 Youngs Avenue, West Warwick, Rhode Island. I have reviewed a Warranty Deed, whereby John V. Andrade and Christine A, Andrade, for consideration paid, granted to PECKHAM the real property known as 58 Youngs Avenue, West Warwick, Rhode Island. Later in the conversation, the following occurred:

| | |
|---|---|
| PECKHAM: | Unless you don't want the sa! Unless you don't want the sus, I got someone who wants those? |
| CS #2: | Oh! You got somebody else who can take the sus? |
| PECKHAM: | Yeah. |
| CS #2: | Can I order, can I get back at those in a week or so, can I order them again? |
| PECKHAM: | Maybe yeah, yeah, actually yeah, probably, yeah. |
| CS #2: | All right. Now um, one of the guys I use to deal with, my buddy Jay, one of the kids who's getting from me regularly, before. |
| PECKHAM: | What kid? Before? Okay go ahead. |
| CS #2: | Can you still get, um, any of those, um, the research stuff that you had? |
| PECKHAM: | Naw! |
| CS #2: | Testenathate? |
| PECKHAM: | Naw, no. |
| CS #2: | Can't get any of that? |
| PECKHAM: | Nope. Unfortunately no. |
| CS #2: | So the sus, the sus is the only test you can get right now? |
| PECKHAM: | Yeah. |
| CS #2: | Okay. |
| PECKHAM: | Yup. All right. |
| CS #2: | And um, all right, just so I know what I have to take out of the bank, um, How many of the Winstrols do you have? |
| PECKHAM: | Cuz, I have ninety of those |
| CS #2: | And they were fifteen a piece? |
| PECKHAM: | Yes, so that would be thirteen-fifty |
| CS #2: | Thirteen-fifty. |
| PECKHAM: | Could you get that to me, just so I could cover those? |
| CS #2: | Ahh! I ca.. Um.. You know what? Can I call ya.. Shit.. Yeah, do it, just do it. I'll um, the mechanic I'm friends with, I'll ah.. I'll work something out with him, don't worry about that I don't want to, I don't want to... I don't want to fuck you over at the same time. |

PECKHAM: All right.
CS #2: So I'll do the thirteen-fifty, but them, um, like next week, maybe early next week, the middle of next week can I order some sus from ya?
PECKHAM: Sus, alright.

Based upon my training and experience, I know that Winstrol is the trade name for Stanazolol, an anabolic steroid and schedule III controlled substance. I believe that in this conversation, PECKHAM is telling CS #2 that he currently has ninety (90) Winstrol one milliliter ampoules in his possession, for sale at fifteen dollars per ampoule. CS #2 agrees to purchase ninety ampoules for a total price of $1,350.00. Further in the conversation, the following occurred:

CS #2: That's good. What's your day Saturday look like?
PECKHAM: I'll be home.
CS #2: Your going to be home Saturday?
PECKHAM: Yeah.
CS #2: Are you gonna be.
PECKHAM: In fact, I might be going home tomorrow night, though.
CS #2: Tomorrow night your gonna be going home?
PECKHAM: Yeah.
CS #2: Are you going to be, are you gonna be up at the gym at all tomorrow? Because some of it's…
PECKHAM: The thing is I'm not going home tonight. I got, I got everything at home.

Based upon my training, experience, and conversations with CS #2, I believe that PECKHAM is telling CS #2 that he will sell him the steroids at his residence. I know, based upon my review of real estate documents, surveillance, and information from CS#2 that PECKHAM currently resides at 58 Youngs Street, West Warwick, Rhode Island. I believe based upon my training and experience, that PECKHAM is telling CS #2 that the steroids are currently stored at this location, when he states, "I got, I got everything at home".

18. On March 25, 2005, I along with TFA Faella and Postal Inspector Correia met with CS #2. Agents searched CS #2 and the vehicle utilized by CS #2 for money and contraband. Agents provided CS #2 with $1,350.00 in official government funds and a digital audio recorder. Agents followed CS #2 to 58 Youngs Street, West Warwick, Rhode Island and observed CS #2 enter the residence. A short time later, agents observed CS #2 exit the residence. Agents followed CS #2 to a post-meet location and retrieved several boxes containing ampoules labeled, "Winstrol Depot" and one ampoule labeled, "Sustenone" from CS #2. Agents searched CS #2 and the vehicle utilized by CS #2 for money and contraband with negative results. An ampoule labeled "Winstrol Depot", obtained from CS #2, was subsequently submitted to the Rhode Island State Toxicology Laboratory and found to contain Stanozolol, a schedule III anabolic steroid. The ampoule labeled "Sustanon" was also submitted to the Rhode Island State Toxicology Laboratory and found to contain Testosterone Propionate, Testosterone Isocaproate, Testosterone Phenylpropionate, and Testosterone Undecanoate. All four of these substances are schedule III anabolic steroids.

19. CI#1 has told me that Garra Verduchi is the longtime girlfriend of PECKHAM. On numerous occasions, agents have observed PECKHAM's vehicle parked overnight at Verducci's residence at 1666 Mendon Road, Cumberland, Rhode Island. I have reviewed records obtained from the Rhode Island Secretary of State that indicate Garra Verduchi is the primary officer of Verduchi Properties LLC and Verduchi Salon. According to these records, PECKHAM is not listed as being a partner, officer, registered agent, nor a person associated with either of these businesses. I have observed Verduchi Salon, located at 1666 Mendon Road, Cumberland, Rhode Island. I have

reviewed a Mortgage Deed and Assignment of Leases and Rents, indicating Verduchi Properties, LLC purchased the real property known as 1666 Mendon Road, Cumberland, Rhode Island from John and Graciete Constantino in June of 2004. According to the Mortgage Deed, Verduchi Properties LLC was to pay $230,000, in ten years, at a rate of six percent per annum to the Constantinos. Based upon my past observation of PECHAM'S signature, I believe PECKHAM signed the Mortgage Deed and the Assignment of Leases and Rents as an authorized member of Verduchi Properties LLC. I have also reviewed Citizen Bank records for Verduchi Properties, LLC, including a copy of a cashed check #1022. The check was pay to the order of Graciete Constantino for $1,378.97.00. In the for section of the check, "August Mortgage" is handwritten. Based upon my past observations of PECKHAM'S signature, I believe the check was signed by PECKHAM.

20. I have executed or assisted in the execution of dozens of state and federal search warrants for steroids, narcotics, and other controlled substances, and for the records, books, documents, and proceeds derived from the trafficking of controlled substances. I have testified concerning the distribution and possession of controlled substances. I have received training from the FDA and other law enforcement agencies in the means and methods used by persons in the drug trafficking business to manufacture and distribute controlled substances and to disguise the source of proceeds generated from drug trafficking.

21. I have been involved in numerous seizures of controlled substances including steroids. I have been involved in searches of dwellings and buildings out of which controlled substances have been sold or stored, and in which drug traffickers have

resided. I have also had numerous conversations with agents, who have processed or assisted in the processing of clandestine drug laboratories.

22. I have learned of, observed, or seized papers showing dates, names, and amounts, which papers I believe to be drug ledgers; papers and photographs showing residency or occupancy of said premises; United States currency, which I believe to be the proceeds of drug trafficking; firearms; controlled substances; financial records, including wire transfer receipts, believed to represent drug trafficking proceeds or payments for controlled substances; and keys for safety deposit boxes where the proceeds of drug trafficking could be stored.

23. I know from this investigation as mentioned in paragraphs 5 and 11 above, that PECKHAM has kept or distributed certain documents regarding his illicit activities. I know further from my training and experience that drug traffickers, more often than not, keep controlled substances, as well as records containing names, addresses, and telephone numbers of purchasers and suppliers of controlled substances, as well as records containing names, addresses, and telephone numbers of purchasers and suppliers of controlled substances, and records of amounts of money owed both to and by the drug seller in their homes and in other premises used by them. These records are necessary to further the business of selling controlled substances. Such records and documents have been found in and seized from properties lived in or used by narcotics sellers. Furthermore, I know from my training and experience that these records are maintained not only in paper form, such as bound books, notepads, and pieces of paper, but also in the form of electronic storage such as floppy computer disks and computer hard drives. Furthermore, I know from my training and experience that occupants of these premises

keep on those premises, more often than not, documents and records such as telephone bills, mortgage or rental receipts, mail, photographs, and bank records indicating both occupancy and ownership of those premises. I further note, based upon my training and experience, that drug dealers oftentimes keep proceeds of their drug sales either in their homes or premises used by them or in safety deposit boxes. They do this to avoid forfeiture of said monies placed in a bank account and to avoid detection of said proceeds by the Internal Revenue Service. I further know from my training and experience that drug traffickers:

a) oftentimes place their assets in names other than their own in order to avoid detection and forfeiture of those assets by government agencies;

b) continue to use the assets referred to in subparagraph (a) above and to exercise dominion and control over those assets;

c) readily maintain large sums of cash to run and finance their drug trafficking activities;

d) attempt to legitimize the financial profits made from drug trafficking, and that in order to accomplish this, they utilize domestic and foreign banks, their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts;

e) usually maintain paraphernalia for the packaging, cutting, weighing and distributing of controlled substances, including paraphernalia including, but not limited to, scales, plastic bags, and cutting agents.

24. I know, based upon my training and experience, that persons who traffic in controlled substances normally maintain the records and documents of the kind described

herein for long periods of time regardless of whether their value to the drug dealer has diminished. Oftentimes, this type of evidence is generated, maintained, and then forgotten about. Thus, documents that one would think a prudent person would destroy because of their incriminatory nature are still possessed months or even years after the documents came into the possession of the drug dealer. Oftentimes these individuals do not even realize the incriminatory nature of the documents they keep.

25. I know based upon my conversations with certified members of the DEA Clandestine Laboratory Team that persons who illegally manufacture controlled substances, more often than not, keep controlled substances, as well as records containing, names, addresses, and telephone numbers of suppliers of controlled substances and difficult to obtain items (such as anhydrous ammonia, pseudo ephedrine, and iodine), journals, formulas, and recipes. These records and documents are necessary to further the business of manufacturing controlled substances. Such records and documents have been found in and seized from properties lived in or used by clandestine laboratory operators. I further know based upon my conversations with certified members of the DEA Clandestine Laboratory Team that persons who illegally manufacture controlled substances, more often than not, maintain laboratory equipment (both commercially and privately manufactured) including but not limited to flasks, scales, beakers, HCL gas generators, and hot plates. These items are often necessary to further the manufacturing of controlled substances and because of their potential monetary value and difficulty to obtain are often re-used by the illegal drug manufacturer. Such items have been found in and seized from properties lived in or used by purveyors of illegal clandestine laboratories.

26. I know based upon my conversations with past and present agents of the DEA's Clandestine Laboratory Enforcement Team that persons, who illegally manufacture controlled substances normally maintain the documents and items described in paragraph 16 above for long periods of time. Oftentimes this type of evidence is generated and maintained because of its long-term usefulness to the illegal drug manufacturer.

27. As used in the Affidavit, the term "electronic storage" includes "computer software and memory," which refers to digital information that can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (such as word-processing, graphics, or spreadsheet programs).

28. As indicated above at paragraph 5, PECKHAM has used a computer located at the Powerhouse Gym, 3751 Mendon Road, Cumberland, Rhode Island, to further his illicit activities. During the course of this investigation, I have consulted with other Special Agents, including FDA Special Agent Phil Walsky. SA Walsky has been a Special Agent with FDA for six years. Prior to FDA, SA Walsky was a special agent with the United States Secret Service. SA Walsky has been performing computer forensics since 1997 when he received computer forensics examination training and certification while he was with the Secret Service. He has continued to perform computer forensics as a Special Agent for the FDA's Office of Criminal Investigation. SA Walsky has received training and has gained experience in the usage of specialized computer software and hardware which assists him in examining seized computers. SA

Walsky performs dozens of computer forensic exams a year. The training, SA Walsky has received, includes Seized Computer Evidence Recovery (SCERS) training at the Federal Law Enforcement Training Center, in Georgia in1997, and numerous continuing training over the following years. This continuing training covers various topics of computer forensics investigations such as legal issues, software and hardware components, internet and email dynamics, and other computer related topics. SA Walsky has received additional training for various forensic software and hardware tools that he uses for computer examinations.

29. Based on my discussions with Special Agent Walsky, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drives can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only

overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

30. Also based on discussions with Special Agent Walsky, I know that computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime. In this case, the warrant application requests permission to search and seize records that may be stored on a computer. These records constitute evidence of crime, and I believe that, in this case, the computer hardware is a container for this evidence. This affidavit also requests permission to seize the computer hardware that may contain the records if it becomes necessary for reasons of practicality to remove the hardware and conduct a search off-site.

31. Based upon discussions with Special Agent Walsky, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

a) The volume of evidence. Computer storage devices (like hard disks, diskettes, tapes, laser disks) can store the equivalent of millions of pages of information. A suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

b) Technical Requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

32. I recognize that the computer(s) located at, 3751 Mendon Rd, Cumberland, Rhode Island may be used by functioning companies, and that a seizure of the computers may have the unintended and undesired effect of limiting the companies' ability to engage in business. In response to these concerns, the agents who execute the search will take an incremental approach to minimize the inconvenience to any legitimate business that may be occurring at this address and to minimize the need to seize equipment and data. This incremental approach, which will be explained to all of the agents on the search team before the search is executed, will proceed as follows:

a) Upon arriving at 3751 Mendon Rd, Cumberland, R.I. agents will attempt to create, while at 3751 Mendon Rd, Cumberland, R.I., an electronic "image" of the information stored on the computer(s). Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The computer expert or another technical expert will then conduct an off-site search for the computer files described in the warrant from the "mirror image" copy at a later date. If the computer expert successfully images the computers, the agents will not conduct any additional search or seizure of the computers.

b) If "imaging" on-site proves impractical, or even impossible for technical reasons, then the agents will seize those components of the computer system that the computer expert believes must be seized to permit the agents to locate the computer files described in the warrant at an off-site location. The components will be seized and taken in to the custody of law enforcement agents. If employees of 3751 Mendon Rd,

Cumberland, R.I. so request, the computer expert will, to the extent practicable, attempt to provide the employees with copies of any files that may be necessary or important to the continuing function of legitimate business. If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

33. Based on the foregoing facts, I believe that there exists probable cause to search the two premises described in paragraph 2A above for the following:

a) Powerhouse Gym, 3751 Mendon Road, Cumberland, Rhode Island:

any and all documents, records, papers, notes, correspondence, e-mails, envelopes, receipts, computer printouts, financial documents, ledger books recording income and expenses, bank statements, savings account records, checking account records, bank deposit slips, bank withdrawal slips, checks, cancelled checks, money orders, cashier's checks, records of wire transfers, safety deposit box records, United States currency, and other financial records relating to the operation of Powerhouse Gym or relating to the personal finances of Kenneth PECKHAM; any and all real estate deeds, mortgage documents, purchase and sales agreements, real estate closing documents, records, documents, papers, notes, correspondence, e-mails, envelopes, receipts, computer printouts, and keys relating to any real estate, including but not limited to 58 Youngs Street, West Warwick, Rhode Island; computer systems, data bases, computer programs, software, computer manuals, word processors, magnetic media; any and all paper and electronically stored records of controlled substance transactions or transactions of materials used in the manufacture of controlled substances; paper and electronically stored records containing names, addresses and telephone numbers of

purchasers and suppliers of controlled substances and materials used in the manufacture of controlled substances; paper and electronically stored financial and bank records relating to drug trafficking, money laundering of drug proceeds, or the purchase of materials used in the manufacture of controlled substances; records and photographs indicating ownership, occupancy and control of the described premises; proceeds, such as United States currency, derived from controlled substance transactions; and safety deposit box keys; any and all laboratory equipment, medical equipment, solid, liquid, or gas, used in the manufacture of controlled substances; all in violation of 21 U.S.C. §§ 841 and 846.

b) 58 Youngs Street, West Warwick, Rhode Island:

paper records of controlled substance transactions; paper records containing names, addresses and telephone numbers of purchasers and suppliers of controlled substances; paper financial and bank records relating to drug trafficking and the money laundering of drug proceeds; records and photographs indicating ownership, occupancy and control of the described premises; proceeds, such as United States currency, derived from controlled substance transactions; and safety deposit box keys; all in violation of 21 U.S.C. § § 841 and 846.

34. Based upon the foregoing, there is probable cause to believe that the business known as Ocean State Fitness Incorporated (a/k/a/ R.I. Fitness) d/b/a Powerhouse Gym located at 3751 Mendon Road, Cumberland, Rhode Island was used to facilitate the manufacture and sale of controlled substances in violation of 21 U.S.C. § 841. Therefore, said business is subject to forfeiture pursuant to 21 U.S.C. § 853(a)(2). A restraining order pursuant to 21 U.S.C. § 853 (e) is needed to ensure the continued availability of

said business for forfeiture, since PECKHAM has a history of concealing his interest in property as is indicated in paragraph 19 above. For this reason, prior notice of the restraining order may also jeopardize the availability of the business for forfeiture and, therefore, an ex parte temporary restraining order should be entered pursuant to 21 U.S.C. § 853(e)(2).

Jason Simonian
Jason Simonian
Special Agent
Food and Drug Administration
Office of Criminal Investigations

Subscribed and sworn to before me,
This 27th day of June 2005 at
Providence, Rhode Island.

United States Magistrate Judge